UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                                    )
JOSEPH GOMES,                       )
                                    )   Civil Action No.
        Petitioner,                 )   18-10148-FDS
                                    )
        v.                          )
                                    )
STEVEN SILVA,                       )
                                    )
        Respondent.                 )
_____)

## MEMORANDUM AND ORDER ON
## PETITION FOR A WRIT OF HABEAS CORPUS

**SAYLOR, J.**

This is a petition for a writ of habeas corpus. Petitioner Joseph Gomes is a state prisoner. Following a jury trial, Gomes was convicted of first-degree murder and other charges arising out of a drive-by shooting. He was sentenced to a term of life imprisonment. He now seeks habeas relief pursuant to 28 U.S.C. § 2254.

For the following reasons, the petition for a writ of habeas corpus will be denied.

**I.     Background**

    **A.     Factual Background**

The following facts are taken from the opinion of the Massachusetts Supreme Judicial Court. *See Commonwealth v. Gomes*, 475 Mass. 775, 776 (2016).

In February 2007, the parents of Joseph Gomes owned and resided in an apartment building on Langdon Street in Roxbury. Gomes's sister, brother-in-law, and nephew Anthony DaSilva also resided in the building. *Id*. Gomes did not reside in the building, nor did his co-

defendant Emmanuel DaSilva, who is Anthony's cousin. *Id.* at 777.

On the morning of February 13, 2007, Anthony noticed a black Buick, being driven by David Evans, at the intersection of George Street and Langdon Street. *Id.* Evans drove the car slowly down George Street, looking at Anthony. *Id.* Shortly thereafter, Anthony saw the Buick quickly turn onto Langdon Street. *Id.* Anthony drove away in his own vehicle and Evans followed him in the Buick. *Id.* Anthony circled the block, parked, and ran inside the Langdon Street apartment building. *Id.* at 776-777. Anthony's father, who had been standing outside the building, ran inside with Anthony. The two heard gunshots, as did a neighbor looking out her bedroom window. *Id.* at 777. The neighbor testified that she saw a man chasing the Buick and firing several shots. *Id.*

Around 9:00 a.m., Boston police officers responded to Langdon Street. *Id.* Gomes arrived around the same time, and the police allowed him to enter the apartment building to check on his parents. *Id.* After becoming upset with the police, Gomes was escorted out of the building in handcuffs at 10:00 a.m. *Id.* Once outside, the police released him, and he left in a rented silver Chevrolet Impala with New Hampshire license plates. *Id.*

Police cleared the Langdon Street apartment building and removed four men from the shared basement. *Id.* They arrested the men and charged them with breaking and entering. *Id.* The police secured the apartment building in anticipation of receiving a search warrant, and members of the Gomes and DaSilva families waited in their cars until the search warrant was obtained. *Id.* at 778.

Evans, who had rented the Buick, returned it that afternoon to the rental agency. It had damage to one tire consistent with being struck by a bullet. Evans then rented a silver Nissan Maxima with New Hampshire license plates. *Id.* at 777.

2

At approximately 6:00 p.m., Gomes quickly drove down Maywood Street in his rented Impala. *Id*. at 778. He stopped the car across the street from Evans's house, and near Evans's rented Maxima. A group of men, including Sanchez, Roberto Ramos-Santiago, Joel Perez, and Maurice Cundiff, were standing on a porch. *Id*. at 777-778. Shots were fired from the front and back seats of the Impala, and Gomes then sped off. *Id*. at 778. Boston police officers arrived at the scene minutes later and found Sanchez with a single gunshot wound to the lower back. *Id*. He was transported to the hospital where he arrived in cardiac arrest and was pronounced dead from blood loss. *Id*. Ramos-Santiago sustained multiple gunshot wounds, and a bullet was removed from his arm at the hospital. *Id*. Perez told officers at the scene that the shooters were in a gray, four-door, newer model Chevrolet Impala, and the police broadcast this description over police radio. *Id*.

Two guns, a .38 caliber revolver and a .380 caliber semiautomatic pistol, were used in the shooting. (*Id.* at 779). At the scene on Maywood Street, police recovered one spent .380 caliber shell casing from the curb and one spent .38 caliber bullet from the kitchen floor of a nearby home. *Id*. at 778-779. The bullet recovered from the kitchen and the bullet recovered from Ramos-Santiago's arm came from the same gun. *Id*. at 779.

Shortly after 6:00 p.m., a detective pulled over a Chevrolet Impala that matched the description broadcast over police radio. *Id*. Gomes was driving the car and Emmanuel DaSilva was in the passenger seat. *Id.* Officers searched the vehicle and found six spent .380 caliber shell casings on the front passenger side. *Id.* The recovered .380 shell casings were fired from the same gun as the one recovered from the curb on Maywood Street. *Id*.

At 10:00 p.m., Boston police officers obtained a warrant and searched the Langdon Street apartment building. *Id*. From the first-floor apartment, they retrieved mail from 2006

addressed to Gomes, two bags of marijuana, two electronic scales, and $7,447 in cash. *Id*. From the shared basement, officers retrieved personal papers belonging to Gomes, crack cocaine, marijuana, $545 in cash, a red hooded sweatshirt, a .25 caliber firearm loaded with six rounds of ammunition, a .22 caliber firearm loaded with six rounds of ammunition, a 9-millimeter firearm loaded with eight rounds of ammunition, and a .380 caliber Mauser semiautomatic firearm with no ammunition. *Id*. at 779-780.

### B. Procedural Background

Gomes was charged with murder in the first degree, six counts of armed assault with intent to murder, assault and battery with a dangerous weapon, aggravated assault and battery with a dangerous weapon, four counts of assault with a dangerous weapon, possession of a firearm without a license, and possession of ammunition without a firearm identification card. *Id*. at 780. The case was tried to a jury in Suffolk Superior Court in November and December 2010. *Id*. The Commonwealth's theory at trial was that Gomes was guilty as a joint venturer with Emmanuel DaSilva and that they intended to kill Evans in retaliation for him frightening Anthony DaSilva and causing extended police occupation of the apartment building. *Id*.

On December 13, 2010, Gomes was convicted of first-degree murder, four counts of armed assault with intent to murder, assault and battery with a dangerous weapon, aggravated assault and battery with a dangerous weapon, and two counts of assault with a dangerous weapon. He was given a mandatory sentence of life in prison without the possibility of parole for the murder conviction and a seventeen- to eighteen-year sentence on the conviction of armed assault with intent to murder. He also received shorter concurrent sentences on the remaining convictions.

## II. Standard of Review

Under 28 U.S.C. § 2254(d), a federal court may not issue a habeas petition "with respect

4

to any claim that was adjudicated on the merits in State court proceedings" unless the state court decision (1) "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

A state-court decision is "contrary to" clearly established federal law if it (1) "applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases" or (2) resolves a case differently from the Supreme Court on a set of "materially indistinguishable" facts. *Early v. Packer*, 537 U.S. 3, 8 (2002) (quoting *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000)). In either scenario, the state-court decision must be "substantially different," "diametrically different," "opposite in character or nature," or "mutually opposed" to Supreme Court precedent. *Williams*, 529 U.S. at 405.

A state-court decision involves an "unreasonable application" of federal law if the state court identified the correct governing legal principle from the Supreme Court's decisions, but applied it in an objectively unreasonable manner. *See Lockyer v. Andrade*, 538 U.S. 63, 75-76 (2003) (citing *Williams*, 529 U.S. at 409). The Supreme Court has cautioned that "[a]n *unreasonable* application of federal law is different from an *incorrect* application of federal law." *Williams*, 529 U.S. at 365. The state court's application of federal law must be "more than incorrect or erroneous." *Lockyer*, 538 U.S. at 75 (citing *Williams*, 529 U.S. at 410, 412); *see also Teti v. Bender*, 507 F.3d 50, 57 (1st Cir. 2007) ("A decision can still be reasonable even if the reviewing court thinks it is wrong; 'unreasonable' here means something more than incorrect or erroneous."). Furthermore,

> if it is a close question whether the state decision is in error, then the state decision cannot be an unreasonable application . . . [S]ome increment of

> incorrectness beyond error is required. The increment need not necessarily be
> great, but it must be great enough to make the decision unreasonable in the
> independent and objective judgment of the federal court.

*McCambridge v. Hall*, 303 F.3d 24, 36 (1st Cir. 2002) (internal citations and quotation marks omitted).

**III.     Analysis**

    **A.     Sufficiency of Evidence at Trial**

First, Gomes contends that the evidence at trial was legally insufficient to support his conviction. He alleges that, viewing the evidence in the light most favorable to the Commonwealth, no rational trier of fact could have found beyond a reasonable doubt that he knowingly and intentionally participated in the killing. In particular, he contends that the Commonwealth provided no evidence to prove that he wanted to retaliate against Evans for the events on Langdon Street, and no evidence that he knowingly participated or possessed the intent to kill. He further contends that the evidence of the matching .380 caliber shell casings obtained from Maywood Street and the car does not raise a conclusive inference that the car was involved in the shooting.

Challenges to sufficiency of the evidence on direct review require the court to ask "whether, after viewing the evidence in light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original). Reasonable inferences that may be drawn from the evidence must also be viewed in light most favorable to the prosecution. *Morgan v. Dickhaut*, 677 F.3d 39, 47 (1st Cir. 2012) (quoting *United States v. Andujar*, 49 F.3d 16, 20 (1st Cir. 1995)). For a federal habeas petitioner, the applicant must overcome a standard of review that is "twice-deferential." *Parker v. Matthews*, 132 S. Ct. 2148, 2152 (2012). The petitioner must show (1) that the evidence introduced at trial fell short of the

standard articulated in *Jackson*, and (2) that the state court unreasonably determined otherwise. *See, e.g., Linton v. Saba*, 812 F.3d 112, 123 (1st Cir. 2016) ("a state court decision rejecting a sufficiency challenge may not be overturned on federal habeas unless the 'decision was objectively unreasonable'" (quoting *Parker*, 132 S. Ct. at 2152)). "Unreasonable" means that "the decision evinces some increment of incorrectness beyond mere error." *Winfield v. O'Brien*, 775 F.3d 1, 8 (1st Cir. 2014) (quoting *Leftwich v. Maloney*, 532 F.3d 20, 23 (1st Cir. 2001)).

Under Massachusetts law, to prove that Gomes was guilty of deliberate and premeditated murder as a joint venturer, "the Commonwealth was required to prove that the defendant was (1) present at the scene of the crime, (2) with knowledge that another intends to commit the crime or with intent to commit a crime, and (3) by agreement, was willing and available to help the other if necessary." *Commonwealth v. Zanetti*, 454 Mass. 449, 455 (2009) (internal citations and quotation marks omitted). In addition, the Commonwealth needed to prove that Gomes "shared the mental state or intent for deliberately premeditated murder, which is malice, and, in particular, an intent to kill." *Id.*

On direct review, the SJC determined that, based on the evidence, a reasonable jury could have found as follows:

> [Gomes], whose family lived in the Langdon Street building, was motivated by anger at the events that resulted from Evan's [*sic*] actions toward his nephew, Anthony, i.e., family members having to vacate the house for more than twelve hours, and police securing and apparently intending to search the entire building; that [Gomes] was the driver of the Impala that sped down Maywood Street—the street where Evans lived—and stopped the vehicle directly parallel to the group of young men standing near where Evans's Maxima was parked; that [Gomes] remained stopped at that location while multiple shots were fired from two different weapons at the group of young men; that when the shooting ceased, [Gomes] sped off, quickly removing the shooters from the scene; and that the shell casings located in [Gomes's] vehicle were consistent with at least one casing found at the scene.

7

*Gomes*, 475 Mass. at 781-82. That evidence, the SJC concluded, was "more than sufficient to permit a reasonable fact finder to infer that [Gomes] knowingly participated in the shooting incident and had or shared an intent to kill one or more of the young men standing in the group near Evans's rented Maxima, even assuming for argument that the evidence would not permit a finding that [Gomes] himself shot one of the guns involved." *Id*. at 782.

In support of its conclusion, the SJC cited to its opinions in various cases that concern how the government may prove the requisite knowledge and intent of a joint venturer. In general, these cases stand for the principle that intent may be inferred from a "defendant's knowledge of the circumstances and subsequent participation in the offense." *Commonwealth v. Soares*, 377 Mass. 461, 470 (1979). In particular, the cases support the conclusion that the "knowing participation" and "intent to kill" required to be deemed a joint venturer may be "inferred" by other related actions the defendant has taken, including driving a getaway vehicle. *See Commonwealth v. Williams*, 422 Mass. 111, 121 (1996); *Commonwealth v. Giang*, 402 Mass. 604, 608-09 (1988) (act of driving getaway vehicle sufficient to permit inference of knowing participation); *see also Commonwealth v. Hart*, 455 Mass. 230, 239-242 (2009) (defendant's knowledge of violent history between his brother and victim, and acts of chasing victim with his brother and encouraging his brother to shoot victim were sufficient to establish defendant's knowing participation and intent to kill).

Gomes contends that the SJC's "determination was unreasonable in several ways." (Pet. Rep. Memo. at 2). First, he contends that "the SJC was unreasonable in relying on the fact that shell casings in the car matched one found on the scene." (*Id*. at 3). Specifically, he contends that under Massachusetts law, it is "clear that [] liability for another's murder requires" the defendant to have "knowledge *prior* to the killing," and that the shell casings found in the car

"cannot support a finding that [he] was aware that his passengers were armed and intended violence *prior* to the shooting starting." (Rep. Mem. at 3). However, while the SJC certainly appears to have relied on the shell-casing evidence in upholding the jury's verdict, nothing in its opinion suggests that it considered that evidence as the *only* evidence relevant to Gomes's intent.

Second, Gomes appears to contend that there was no evidence from which a jury could infer that he had the requisite "prior knowledge and intent to join a *shooting*" specifically. (Pet. Rep. Memo. at 3) (emphasis in original). Essentially, Gomes contends that although a jury "could arguably have inferred that the car stopped to look for Evans, there was no evidence whatsoever that petitioner was aware or intended that it would turn into a violent assault . . . let alone that it would be a shooting." (*Id.*). The SJC, however, specifically mentioned other evidence—including, but not limited to, the fact that Gomes was motivated by his anger toward Evans, and that the car remained stopped for long enough to allow for multiple shots to be fired from two guns, only then to speed off quickly—that would allow a reasonable jury to have inferred that Gomes had the knowledge and intent to join a shooting.

Third, Gomes contends that it was unreasonable for the SJC to have relied on *Williams* and *Giang* to conclude that evidence of his having driven a getaway car supported the jury's inference that he had knowledge that his passengers intended to commit the shooting. Gomes appears to contend that the SJC's reliance on those cases was unreasonable because in this case, unlike those, "the purported shooters were allegedly in the same car as [Gomes] at the time they started shooting, and no reasonable jury could expect a defendant surprised by a sudden shooting to stop and require the shooters to get out of his car prior to leaving the scene." (*Id.* at 3-4).

The evidence in *Giang*—that is, that the defendant had waited in his car for the other defendants, and then drove off once they entered the car—may have created a stronger inference

9

of knowledge than the evidence did here. But that does not mean that the SJC was unreasonable in relying on *Giang* and the other similar cases as supporting, at least to some extent, the inference the jury could have made as to Gomes's knowledge. Put simply, while *Giang* does not present exactly the same facts as this case, Gomes has shown no reason why the SJC's reliance on that case was objectively unreasonable.

In sum, the SJC's decision satisfies the standard in *Jackson*, because a "rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson*, 433 U.S. at 319. Its decision does not show an "increment of incorrectness beyond mere error." *Winfield*, 775 F.3d at 8. Therefore, insufficiency of the evidence is not an adequate ground for granting habeas relief.

**B.** **Admission of Prejudicial Evidence**

Gomes further contends that the admission into evidence of certain items, including money, drugs, and guns, recovered from the Langdon Street apartment building violated his due-process rights. Essentially, he argues that the admission of the items into evidence "so infuse[d] the trial with inflammatory prejudice that it render[ed] a fair trial impossible." *Lyons v. Brady*, 666 F.3d 51, 56 (1st Cir. 2012).

"[A]n erroneous evidentiary ruling that results in a fundamentally unfair trial may constitute a due process violation and thus provide a basis for habeas relief." *Id*. at 55 (citing *Coningford v. Rhode Island*, 640 F.3d 478, 484 (1st Cir. 2011)). For habeas relief to be warranted, "the state court's application of state law must be 'so arbitrary or capricious as to constitute an independent due process . . . violation.'" *Coningford*, 640 F.3d at 484 (quoting *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990)).

Under Massachusetts law, "evidence of uncharged criminal acts or other misbehavior is

not admissible to show a defendant's bad character or propensity to commit the charged crime, but may be admissible if relevant for other purposes such as 'common scheme, pattern of operation, absence of accident or mistake, identity, intent, or motive.'" *Commonwealth v. Dwyer*, 448 Mass. 122, 128 (2006) (quoting *Commonwealth v. Marshall*, 434 Mass. 358, 366 (2001)). Evidence of motive does not have to be conclusive to be admissible. *Commonwealth v. St. Germain*, 381 Mass. 256, 271 (1980). It need only provide "a link in the chain of proof." *Commonwealth v. Arroyo*, 442 Mass. 135, 144 (2004).

Here, the trial judge admitted the items for the limited purpose of proving Gomes's knowledge, motive, or intent. *Gomes*, 475 Mass. at 783. The SJC found that the evidence "was relevant with respect to all three of these issues." *Id*. Essentially, the SJC concluded that Gomes may have held Evans responsible for causing him and his family to lose these "valuable items" to the police and therefore sought to retaliate against him. *Id*.

The SJC acknowledged that "little connection" may have been shown "between [Gomes] and the specific contraband items found in the building," but concluded that "the link between the over-all inconvenience to the defendant's family and his alleged motivation to commit the crime was certainly strong enough to satisfy the threshold requirement of relevance." *Id*. at 784. It also concluded, however, that the evidence "present[ed] a real potential to paint [Gomes] generally as a violent man connected to a violent family and involved in a life of crime" and "present[ed] a threat of being used improperly by the jury as evidence of bad character and criminal propensity." *Id*.

Accordingly, the SJC concluded that "[t]he question of whether the evidence was more prejudicial than probative is close," but that, given the "substantial discretion" possessed by the trial judge, and the trial judge's instruction to the jury "that the evidence was offered for a

11

limited purpose and [that they] were not to consider the evidence for the purpose of 'criminal propensity' or 'bad character,'" the decision to admit the evidence was not in error. *Id.* at 785. In addition, the SJC noted that "even assuming that the evidence should not have been admitted, the admission would likely not qualify as prejudicial error warranting reversal, given the strength of the evidence that the defendant knowingly participated in the Maywood Street shooting incident with the requisite intent to kill." *Id* at 785, n. 17.

Gomes contends that "it was clear and obvious that the evidence should not have been admitted." (Pet. Rep. Memo. at 5). Specifically, he contends that the probative value of the evidence was minimal and there was a substantial risk of prejudicial impact. (*Id.*).

Those contentions are not entirely frivolous, and a different court might well have decided differently. But that is not the standard here. Instead, on habeas review, the question is whether the SJC's decision was "so arbitrary or capricious as to constitute an independent due process violation." *Lewis*, 497 U.S. at 780. Because it clearly was not, relief will not be granted as to that ground.

## IV.     Conclusion

For the foregoing reasons, the petition for a writ of habeas corpus is DENIED.

**So Ordered.**

/s/ F. Dennis Saylor
F. Dennis Saylor IV
Dated: June 20, 2019                          United States District Judge